**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NICHOLE FRIESON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 07-CV-3129 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| COUNTY OF COOK, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Nichole Frieson claims that she was discriminated against on the basis of her sex when she was harassed by a homosexual co-worker. She also claims retaliation for prior EEO activity. Defendant Cook County filed a motion for summary judgment [71] on all of Plaintiff's claims. For the following reasons, the Court grants Defendant's motion.

**I.      Background**

**A.      Plaintiff's Response to Defendant's Statement of Facts**

It is the function of the Court, with or without a motion to strike, to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004). "Pleadings that do not conform with the local rules may be stricken at the discretion of the court." *Id*. at 640 (citing *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1103 (7th Cir. 1990)); *Pfeil v. Rogers*, 757 F.2d 850, 858 (7th Cir. 1985); *Graham v. Security Sav. & Loan*, 125 F.R.D. 687,

688-89 (N.D. Ind. 1989), *aff'd*, 914 F.2d 909 (7th Cir. 1990)). The Court's scrutiny of material statements of facts applies equally to the party seeking summary judgment and the party opposing it.

In the instant case, Defendant complains that Plaintiff has not complied with the local rules. In some instances, Defendant is correct. In her response to Defendant's statement of facts, she states that a number of facts are "not disputed" but then attempts to modify the statement by adding information. See Plaintiff's Response to Defendant's Statement of Facts ("SOF") ¶ ¶ 9, 11, 12, 17, 18, 24, 27, 28, 35, 37, 44, 49, 50, 63, 64, 68, 69, 71, 74, 76, 77. For example:

> 17. In March of 2006, a "Last-Chance Agreement" was entered into by Plaintiff, her union and Stroger Hospital. Plaintiff signed it on March 17, 2006 along with two of her union representatives. (Ex. B, Pltff. Dep. at p. 86, ll. 16-19; p. 87, ll. 2-20; Ex. I, Pltff. Dep. Ex. 6, Last Chance Agreement dated March 2006; Ex. E, Affidavit of Alisia Hill ¶ 8)

> RESPONSE: Not disputed. Plaintiff, however, maintains that this agreement was signed under duress. Further Plaintiff states that the agreement was not explained to her and she was not allowed to have an attorney present. Ex. A, Frieson Affidavit, ¶ 26, 27.

Providing new or additional facts in a response is improper. See, *e.g., Hanson v. Prairie Material Sales, Inc.*, 2001 WL 1105097, at *1 fn. 1 (N.D. Ill. Sept. 20, 2001) ("Plaintiff has provided responses which fail to deny Defendant's statement and instead attempt to supply additional facts * * * * It is deemed as admitted all 56.1 responses which fall into this category."); see also *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2004) ("Rule 56.1(b)(3)(B) provides the only acceptable means of * * * presenting additional facts.") (citations omitted).

In other instances, Plaintiff "does not dispute the quoted testimony" but attempts to modify a statement of fact by adding new information, citing only to her affidavit as support. Plaintiff does this in her responses to Defendant's SOF ¶ ¶ 64, 68, 69, 71, 74 and 77. Plaintiff's

affidavit, created after her deposition, introduces new additional facts and characterizes her deposition testimony in a different way. All of Plaintiff's additional facts rely upon Plaintiff's affidavit for support. However, Plaintiff's affidavit does not comply with the requirements of Rule 56(e). An affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed.R.Civ.P. 56 (e)(1). Although an affidavit does not necessarily need to be notarized to be admissible, an unsworn affidavit must be declared true "under penalty of perjury," signed, and dated to be admissible. See 28 U.S.C. § 1746; *Cornelius v. Hondo Inc*., 843 F. Supp. 1243, 1247 (N.D. Ill. 1994); *Mazeika v. Architectural Specialty Products, Inc*., 2006 WL 2850480, at *1 n.1 (N.D. Ill. Sept. 29, 2006). Plaintiff's affidavit is not notarized, the information contained within it is not declared true "under penalty of perjury," and it is not dated. This Court recently has held that an affidavit that is "not dated and does not contain the requisite 'under penalty of perjury' language * * * must be stricken."[1] *Hu v. Village of Maywood*, 2010 WL 276704, at *5 (N.D. Ill. Jan. 19, 2010). Because each of Plaintiff's fifty-four additional statements of fact relies solely upon Plaintiff's own affidavit, which does not comply with the requirements of Rule 56(e), this Court will not consider them.

Furthermore, a plaintiff cannot defeat a motion for summary judgment by "contradict[ing] deposition testimony with later-filed contradictory affidavits." *Ineichen v. Ameritech*, 410 F. 3d 956, 963 (7th Cir. 2005). See also *Holland v. Jefferson Nat'l Life Ins. Co*., 883 F.2d 1307, 1312 (7th Cir. 1989). As the Seventh Circuit further explained in *Bank of Illinois*, "we have long followed the rule that parties cannot thwart the purpose of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions * * * * If such

---

[1]  Plaintiff is represented by court-appointed counsel, and was at the time she filed her opposition materials, including the affidavit, whereas the plaintiff in Hu was *pro se*.

contradictions were permitted * * * the very purpose of the summary judgment motion – to weed out unfounded claims, specious denials, and sham defenses – would be severely undercut.'" *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996).

In sum, any statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on Defendant's motion for summary judgment. Any paragraph or fact that is not supported by record evidence will be disregarded. Indeed, the Court has not relied on any evidence as to which the admissibility is disputed in its disposition of Defendant's motion for summary judgment.

**B.    Facts**

*1.    Plaintiff's employment*

Plaintiff Nichole Frieson began working for Cook County on June 16, 2003, as an electrocardiogram ("EKG") technician (also referred to as a telemetry technician) at John H. Stroger Hospital ("Stroger Hospital"). As an EKG technician, Plaintiff was responsible for observing and monitoring the cardiac activity of patients on monitors, receiving the EKG reports for the prior shift, and observing and reporting any abnormalities to the nurses and doctors. Plaintiff and Defendant agree that Plaintiff's job included these duties: to observe and interpret cardiac activity as seen on the monitor to ensure prompt discovery of abnormal rhythms; to notify the appropriate staff member so proper intervention can be done; to document and maintain patient records according to the required guidelines; to assist in general unit functions and indirect patient care; to function as a team member; and to facilitate cohesiveness and quality patient care.

The EKG technicians at Stroger Hospital monitor EKG's on two floors in six different areas: 8th floor East, 8 West, 8 South, 7 East, 7 West, and 7 South. Plaintiff typically was

assigned to 8 East, but would "float" to relieve co-workers in other areas when they would take their lunch break. The number of patients on each floor ranged from seven or eight up to twenty-two. Two technicians were assigned on the 7th floor and two on the 8th floor, for a total of four (although sometimes three) technicians per shift. Plaintiff monitored the EKGs by observing display monitors showing the patients' heart activity at a desk station on each floor.

Plaintiff began her employment with several co-workers, including Llyonnie Fair and Jori Williams, who went through orientation together in the same "class." Plaintiff believes that Ms. Fair was homosexual and felt threatened, harassed, and bothered by Plaintiff. On July 8, 2004, shortly after being hired, Plaintiff had a verbal altercation with Ms. Fair regarding shift assignments. Ms. Fair worked from 7 a.m. to 3 p.m. on 8 East, and Plaintiff worked from 3 p.m. to 11 p.m. on 8 East. Plaintiff was late for work, and, when she got there, Ms. Fair was working overtime on 8 East. Plaintiff believed that she should be working on 8 East instead, so she grabbed the phone to call a supervisor. Plaintiff claims that Ms. Fair put her hand on Plaintiff's to stop Plaintiff from calling. Plaintiff and Ms. Fair both received pre-disciplinary hearings regarding the altercation as well as written reprimands, and both were notified that subsequent incidents of inappropriate conduct or performance issues would be addressed with progressive discipline up to and including discharge.

In her 2004 performance evaluation, Plaintiff's performance level was marked as "Good Performance – Usually Competent at the Expected Level." Plaintiff also was told that her personal calls must be stopped, that her attendance and punctuality must be improved, that she should work on establishing a good relationship with peers, and that she should attend workshops and in-service to increase her knowledge in reading and interpreting EKG strips.

On January 1, 2006, during Plaintiff's shift when she was assigned to monitor patients, one of Plaintiff's patients exhibited abnormal cardiac rhythm that resulted in cardiac arrest. Defendant claims that Plaintiff silenced the telemetry alarm system multiple times instead of responding to it, and, as a result, the cardiac arrest went undetected for an unknown period of time and the patient died and was later found on the bathroom floor. Plaintiff claims that she was told that the individual was to be watched, that she had carefully watched his heart rate throughout her shift, and that she notified the nurses of any abnormalities. Plaintiff was charged with: 1) failing to follow instructions and/ or failing to work in accordance with the County's policies, procedures and practices and 2) performance at less than satisfactory level in her job classification. Plaintiff was notified of the charges against her and was given a pre-disciplinary hearing on January 26, 2006. The charges were upheld, and on January 31, 2006, Plaintiff was terminated from her employment with Stroger Hospital.

As a result of negotiations, on March 17, 2006, a "Last-Chance Agreement" was entered into by Plaintiff, her union, and Stroger Hospital. The parties agreed "that th[e] Agreement is a last chance Agreement for one year with respect to job performance. Should Frieson have what is determined to be poor work performance, Frieson will be subject to termination." Shortly after the Last Chance Agreement was signed, Plaintiff was brought back to work as an EKG technician pursuant to its terms. Plaintiff was to work in the same capacity as an EKG technician with the same job description and responsibilities, but was assigned to the 7th floor instead of the 8th floor. Plaintiff felt that her move to the seventh floor after she was reinstated was "retaliation" since she was moved out of her "habitat that [she] had the feel of" and "had to get to know everybody all over again." SOF ¶ 20

On July 17, 2006 the Supervisor of Nursing, Alisia Hill, gave Plaintiff a written reprimand about her poor performance after she failed to report to her assigned area to receive a telemetry report. Plaintiff was instructed to obtain and give a report at the beginning and end of every shift that she worked. On August 23, 2006, Hill spoke with Plaintiff regarding her customer service skills after Plaintiff allegedly was unreasonable to a patient and he complained about her. Plaintiff she was told that she could face disciplinary action for failing to provide proper customer service.

On December 7, 2006, a disciplinary hearing was held to address three new allegations against Plaintiff stemming from three separate incidents. The first charge was that on November 4, 2006, Plaintiff left her assigned work area during work hours without permission from her supervisor. According to Defendant, Plaintiff is required to remain at the station unless she has permission to leave. Plaintiff admits that she was gone from her station for approximately fifteen minutes when she went to complain to the Cook County Police about a verbal altercation with a co-worker. Plaintiff also admits that it was a part of her job to stay at the station because she could not see the patients' heart activity when away from the station. During her deposition, Plaintiff could not recall whether she had spoken to the on-call supervisor to get permission to leave before or after she left her station, and she could not recall the name of the supervisor with whom she spoke. She also forgot that during the pre-disciplinary hearing, she testified that she had attempted to contact the supervisors but was not successful.

The second charge against Plaintiff was that she falsified a medical document. Plaintiff requested leave for November 7, 2006, but was told she could not have the day off due to scheduling. Despite being told she could not have the day off, she called in sick on that date. On November 8, 2006, she submitted a Mercy Hospital "work status discharge sheet" to Defendant

to support her absence. The document reflected that Plaintiff had received treatment on November 7, 2006, and that she "[m]ay perform full duty work as of * * * 11/8/06." SOF ¶ 31. The date – November 8, 2006 – was handwritten on the document. Alisia Hill believed that it may have been altered because the number 8 had darker writing over it and appeared to have been changed from a '7' to the number '8.' At Defendant's request, Mercy Hospital sent a follow up note for clarification. That note states that Plaintiff was seen on November 7, 2006 and that she could return to work on November 7, 2006, not November 8, 2006.

The third charge was that Plaintiff failed to follow supervisor instructions on November 24, 2006, when Greg Murphy, the Director of Nursing, asked her to remove her coat because she was not supposed to have it on while on duty. Plaintiff took her coat off for a few minutes, but then put it back on when Murphy left because she was uncomfortably cold due to an anemic condition.

Plaintiff was notified of the charges before the hearing and acknowledged that she had an opportunity to present her side of things at the hearing and "held nothing back." Two union representatives were with her as well as witnesses to each of the three incidents. All three charges were found to have merit and were upheld. Falsification of the medical statement was a "major cause infraction" under the Cook County rules and regulations, and Plaintiff was terminated from her employment for the second time on December 22, 2006. Plaintiff appealed the decision. A termination appeal hearing was held, and the appeal was denied on June 23, 2007.

On February 21, 2006, after her first termination from Stroger Hospital, Plaintiff filed a charge of discrimination with the EEOC.[2] During her deposition, Plaintiff testified that shortly

---

[2]    Plaintiff received a Dismissal and Notice of Rights form dated March 2, 2007, and filed her First Amended Complaint on July 30, 2007.

after she was hired she began to be harassed by a co-worker, who is homosexual.  Plaintiff believes that the harassment from co-worker Llyonnie Fair started "maybe three" or "four to six months" after Plaintiff started working for Defendant in June of 2003.  Plaintiff testified that the first time she could recall Llyonnie Fair touching her in an "inappropriate" manner was when Ms. Fair touched Plaintiff's hand during their altercation on July 6, 2004.  Plaintiff felt Ms. Fair was "harassing" her when Ms. Fair "was talking to me in, you know, very rude and telling me she wasn't going downstairs * * * " to talk to the supervisor.  Plaintiff testified that she reported Ms. Fair's conduct to a supervisor, but she could not recall the name of the supervisor to whom she reported.

Plaintiff testified that the next time Ms. Fair touched her was at the end of 2004.  This occurred when Plaintiff was changing shifts with Ms. Fair and Ms. Fair rubbed against Plaintiff as she walked past her to change shifts.  Ms. Fair worked the shift before Plaintiff's shift.  The telemetry station was surrounded by the patient monitors, and had two chairs side-by-side near the computer monitors in front of them.  Behind the computer area of the station was a counter with printers and other equipment, which was about four feet away.  Plaintiff admits that the entire station area was "sort of small."  Plaintiff could not recall what part of Ms. Fair's body touched her when Ms. Fair brushed past her.  She never really looked, but believes it could have been Ms. Fair's hips touching her side as she went past her in their telemetry station when changing shifts.  Plaintiff could not recall any other incidents where Ms. Fair touched her other than during the verbal altercation on July 6, 2004.

Plaintiff testified that she felt threatened by Ms. Fair.  Plaintiff stated she had overheard Ms. Fair speaking with someone on the telephone sometime in April of 2005 and believed that Ms. Fair was making fun of her.  Plaintiff assumed that the conversation was about her, but

admitted that she never actually heard her name mentioned.  Plaintiff started developing anxiety after she overheard the call because she did not know if Ms. Fair "was trying to send somebody up to the hospital to kill me, to hurt me, to do any type of bodily damages."  Plaintiff also believes that Ms. Fair threatened her during the incident on July 6, 2004.  Plaintiff could not remember specifically, but stated that after she asked Ms. Fair to let go of her hand, Ms. Fair asked her "what will you do if I don't release your hand?"  Plaintiff believed this to be a threat, but stated that she "just kind of blew it off."

After she overheard Ms. Fair's conversation, Plaintiff began to see psychologist Helen Evans on May 11, 2005.  Plaintiff admits that emotionally, she was "just not right" and admits that she had been diagnosed as "bipolar."  Although there were never direct threats, Plaintiff testified that "there were rumors" and co-workers told her to "watch her back."  She believed that the rumors were based on co-workers overhearing Ms. Fair; however, she was unable to recall the name of any co-worker who relayed any rumors to her.

Plaintiff testified that when she started to complain about Ms. Fair, there was a "whole conspiracy at Cook County Hospital amongst [her] department" against Plaintiff.  She believed that Ms. Fair was homosexual and "very flamboyant" and "wanted everybody to know what she was."  She believed it was "flamboyant" that Ms. Fair "brought her lover to the job, and witnesses have seen that, seen that with their own eyes several times."  Plaintiff believed that Ms. Fair "had managers and everything on her side" and that her complaints went unheard because "management being * * * in favor of * * * being the same thing as Ms. Fair * * *."  SOF ¶ 60, 61.  Plaintiff believed that her supervisors, Alisia Hill and Director of Nursing Greg Murphy, also were homosexual.  Plaintiff felt that she was discriminated against because she is a female and "they were gay, and basically gay women that know you're heterosexual don't like

regular, regular women" and felt that Hill and Fair "have a thing against women that are straight." SOF ¶ 62.

Plaintiff believed Fair was treated more favorably because management approved days off for Ms. Fair but not for Plaintiff. When asked for specific instances when this occurred, Plaintiff could not identify any actual dates. Plaintiff also complained about being shorted on her paychecks. When she brought these instances to Hill's attention, the shortages were corrected and Plaintiff received a paycheck for the shorted amount.

Plaintiff also felt that she was working more holidays than other employees. Holidays were assigned using a Vacation Request Schedule, which was posted for employee review. On the schedule, employees would fill in the date of their request and a ranking of their first, second, and third choices of the holidays that they wanted off. The decisions were based on seniority. For instance, if someone more senior requested a particular holiday off, the senior employee generally would get that day off. If two employees with the same seniority requested the same holiday off, the employee to first request the holiday off would be awarded the holiday. When asked to specify how she was unfairly asked to work holidays that she had requested off, Plaintiff could not recall the particulars. Plaintiff also could not recall which holidays she had to work. Plaintiff thought she remembered co-worker Charity Owens getting either "Thanksgiving, Christmas, or New Year's" off over her, but admitted that was because Ms. Owens had more seniority than she did. Plaintiff also testified that co-worker Jori Williams had two holidays off in a row. Plaintiff did not recall whether Ms. Williams had put in her requests earlier than she had. During her deposition, Plaintiff was shown the Vacation Request Schedule for October 2006 to March 2007, and Plaintiff was unable to point to any holidays that she had to work that did not follow the standard protocol.

Plaintiff also claims that other co-workers engaged in the same behavior as her but were not reprimanded. Plaintiff testified that her supervisors called her into the office to discuss her tardiness "almost every other day" but that other employees were not questioned when they were late. Plaintiff could not provide any dates that this occurred and acknowledged that she does not know how other cases of tardiness were disciplined. Plaintiff also claims she was denied use of vacation time when other employees were allowed to use vacation time; however, she could not identify any specific dates to support her claim.

## II.     Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586

(1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position

will be insufficient; there must be evidence on which the jury could reasonably find for the [non-

movant]." *Anderson,* 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination

cases, nor is there a separate rule of civil procedure governing summary judgment in

employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.*, 263 F.3d 673,

681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir.

1997)). However, intent and credibility frequently are critical issues in employment cases that in

many instances are genuinely contestable and not appropriate for a court to decide on summary

judgment. See *id*. Nevertheless, summary judgment in favor of the defendant is hardly unknown

or, for that matter, rare in employment discrimination cases. *Wallace*, 103 F.3d at 1396.

## II.    Analysis

### A.    Plaintiff's Title VII Discrimination Claim[3]

---

[3]  In her response brief, Plaintiff sets forth her claim as a disparate treatment sex discrimination claim, not as a hostile work environment claim, even after Defendant pointed out in its opening brief that Plaintiff's complaint states that she was "harassed by a co-worker, who is a homosexual." However, Plaintiff did not make any allegations of a sexual harassment "hostile work environment" claim in her EEOC complaint and has not alleged a "hostile work environment" beyond alleging that she was harassed by a homosexual co-worker. Additionally, the evidence presented does not come close to supporting a claim for hostile work environment. Workplace harassment "must be sufficiently severe or pervasive" to be actionable. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986); *Russell v. Bd. of Trs. of the Univ. of Ill.*, 243 F.3d 336, 342-43 (7th Cir. 2001). To prevail on a hostile environment claim, the plaintiff must show that the work environment was both subjectively and objectively hostile. See *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21-22 (1983). An objectively hostile work environment is one that a reasonable person would find hostile or abusive. See *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998). In determining whether a plaintiff has met this standard, a court must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; see also *Russell*, 243 F.3d at 343; *Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Adusumilli*, 164 F.3d at 361 (internal citations omitted). At best, the two incidents of

In Count I, Plaintiff claims that Defendant discriminated against her on the basis of sex in violation of Title VII of the Civil Rights Act when she was disciplined and ultimately fired from her job as an EKG technician. See Pl.'s Resp. at 9. Title VII prohibits discrimination in employment: "It shall be an unlawful employment practice for an employer * * * to discharge any individual because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prove a case of discrimination under Title VII, a plaintiff may show discrimination under either the "direct" or "indirect" methods of proof. *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008) (explaining the misleading nature of this nomenclature and reiterating that the direct method may be proven with either direct or circumstantial evidence and that the indirect method proceeds under the burden-shifting rubric set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973)); see also *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Under the direct method of proof, the plaintiff may introduce either direct or circumstantial evidence to create a triable issue as to whether the adverse employment action was motivated by a discriminatory intent. *Id.*; see also *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 794 (7th Cir. 2005); *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997). In other words, the plaintiff must show either "an acknowledgement of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 272 (7th Cir. 2004) (citing *Gorence v. Eagle Foods Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001)).

---

"touching" and the alleged rumors of a threat that Plaintiff points to are evidence of a personality conflict with Ms. Fair and not sufficiently "severe or pervasive" to establish a hostile work environment. Therefore, the Court analyzes Plaintiff's claim as one for disparate treatment sex discrimination.

Under the indirect method of proof initially set forth in *McDonnell Douglas Corp. v. Green*, a plaintiff first must establish a *prima facie* case of discrimination. 411 U.S. 792, 802-04 (1973). In order to establish a *prima facie* case of race, sex, and/or age discrimination, a plaintiff must establish that: (1) she was a member of a protected class; (2) she was qualified for the job or was otherwise meeting the defendant's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside the protected class more favorably. See *Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 538 (7th Cir. 2007).

If the plaintiff successfully establishes a *prima facie* case, a rebuttable inference of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. See *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997); see also *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Once the defendant provides a legitimate explanation, the burden then shifts back to the plaintiff to prove that the proffered justification is pretext. *Fane*, 480 F.3d at 538. The Seventh Circuit has counseled that where a plaintiff has not met his burden of showing that a defendant's explanations are merely a pretext for discrimination, it is not necessary for a court to decide whether the plaintiff also established a prima facie case. See *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir. 1990); see also *Box v. A & P Tea Co.*, 772 F.2d 1372, 1378 (7th Cir. 1985) (moving directly to third step of *McDonnell Douglas* approach where defendant articulated and offered proof of a legitimate, nondiscriminatory reason for adverse employment action). In this case, it makes sense to do just that, since Plaintiff, in her opposition materials, does not put forth any arguments or admissible evidence related to pretext, despite the non-discriminatory reason offered by Defendant in its opening brief.

In its opening brief, Defendant put forth evidence that Plaintiff was fired because she committed a "major cause" infraction when she falsified a medical document. In her deposition, Plaintiff admitted that the document she submitted from Mercy Hospital had darker writing on the handwritten date indicating when she was to return to work. Falsification of the medical statement was a "major cause infraction" under the Cook County rules and regulations. Plaintiff was aware of these rules and regulations and knew that she was required to abide by them. Plaintiff was terminated from her employment on December 22, 2006, for falsifying the medical document. Her termination was upheld on appeal. Since Defendant has put forth a non-discriminatory explanation for its termination of Plaintiff, the burden now shifts to Plaintiff to prove that the bias-neutral reason proffered by Defendant was a pretext or an explanation designed to obscure the unlawful discriminatory employment action. *Emmel v. Coca-Cola Bottling Co. of Chicago,* 95 F.3d 627, 629 (7th Cir. 1996).

In order to avoid summary judgment, a plaintiff must show that the reason given is unworthy of credence. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097 (2000). To accomplish this requirement, a plaintiff must provide evidence to prove that Defendant's reasons were either factually baseless, were not the actual motivation for the action, or were insufficient to motivate the action. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888-89 (7th Cir. 2001). To avoid summary judgment, Plaintiff must show by a preponderance of the evidence that this proffered reason is pretextual. A plaintiff shows that a reason is pretextual "directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). An employer's decision to promote is pretextual

when "it is a lie – a phony reason meant to cover up a disallowed reason. Otherwise, an employer's decision to favor one candidate over another can be 'mistaken, ill-considered or foolish, [but] so long as [the employer] honestly believed those reasons, pretext has not been shown.'" *Id.* (quoting *Millbrook v. IBP, Inc*., 280 F.3d 1169, 1175 (7th Cir. 2002)). In order to establish pretext, Plaintiff must show that Defendant's articulated reason for its decision (1) had no basis in fact; (2) did not actually motivate the Defendant's decision; or (3) was insufficient to motivate the action. *Hughes v. Brown*, 20 F.3d 745, 747 (7th Cir. 1994). Plaintiff must "*specifically* refute facts which allegedly support the employer's proffered reasons"; conclusory statements about an employer's prejudice are insufficient to establish pretext. *Alexander v, CIT Tech. Fin. Servs., Inc.*, 217 F. Supp. 2d 867, 890 (N.D. Ill. 2002) (emphasis in original).

There is nothing in the record that would support a finding that Defendant's stated reason for terminating Plaintiff was a fabrication. Plaintiff has not brought forth any evidence that the reason offered by Defendant – that she falsified a medical document – was a lie. In fact, Plaintiff failed to even address pretext in her response brief. Plaintiff has not provided any evidence (other than her subjective beliefs during her deposition) that any decision was motivated by a sexual animus, or demonstrated that her sex was a factor in the decision to fire her. There simply is no evidence from which a reasonable person could find that Defendant fired Plaintiff because of Plaintiff's gender.

In addition to failing to demonstrate pretext, Plaintiff's discrimination claims falls short of those circumstances in which courts have found discrimination. The fact that there might have been tension or friction between Fair and Plaintiff, without more, is not indicative of the alleged discrimination, but perhaps of a difficult working environment and of differences of opinion within that environment – neither of which is actionable. Furthermore, the Court does

not sit as a "super personnel department" to review an employer's business decisions (see *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000)), and thus cannot adjudicate whether co-workers communicate well, whether Fair or other co-workers was insufficiently sensitive to Plaintiff's emotional needs, whether co-workers "liked" Plaintiff, or whether Defendant made accurate, wise, or well-considered employment decisions. *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered"). Accordingly, Plaintiff has not met her burden of proving that Defendant's articulated legitimate, nondiscriminatory reason for firing her was pretext. In the absence of evidence of pretext, Plaintiff's claim of discrimination must fail. Therefore, the Court grants summary judgment in favor of Defendant on Plaintiff's Title VII claim (Count I).

### D.      Retaliation

In Counts II and III, Plaintiff brings retaliation claims against Defendant, claiming that Cook County shorted her on several paychecks, moved her to another floor, made her work holidays, and eventually fired her in retaliation for prior EEO activity. Under the anti-retaliation provision of Title VII, it is unlawful for an employer to "discriminate against" an employee "because he has opposed any practice made an unlawful employment practice" by the statute or "because he has made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." *Brown*, 499 F.3d at 684 (quoting 42 U.S.C. § 2000e-3(a)). "A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method." *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 662 (7th Cir. 2006) (quotations and citations omitted). "Under the direct method, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) there was a

causal connection between the two." *Id.* at 663 (quotations and citations omitted).  Alternatively, under the indirect approach, in order to establish a *prima facie* case for retaliation, the employee must show that (1) after filing a charge, the employee was subject to adverse employment action; (2) at the time, the employee was performing his job satisfactorily; and (3) no similarly situated employees who did not file a charge were subjected to an adverse employment action.  See *Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 560 (7th Cir. 2004).  "'If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its employment action.'"  *Tomanovich,* 457 F.3d at 663 (quoting *Adusumilli v. City of Chicago,* 164 F.3d 353, 362 (7th Cir. 1998)).  Then, if the employer presents evidence of a non-discriminatory reason for its employment action, "'the burden shifts back to the plaintiff to demonstrate that the employer's reason is pre-textual.'"  *Id.* (quoting *Moser v. Ind. Dep't of Corr.,* 406 F.3d 895, 903 (7th Cir. 2005)).

A plaintiff fails to allege a cause of action under Title VII when she has not alleged that she engaged in statutorily protected expression.  In Count II, Plaintiff's first count of retaliation, the only allegation to which Plaintiff could be referring as being a "protected expression" is her contention that she "made numerous complaints about this employee to management and security of Defendant, none of which resulted in any subsequent discipline against the co-worker."  The record further shows that the only incident that Plaintiff had involving Ms. Fair that Plaintiff may have reported to management was a verbal altercation regarding shift assignments on July 8, 2004.  However, Plaintiff has failed to name the supervisor or supervisors to whom she complained as well as the details of her alleged complaint.  Furthermore, both Plaintiff and Ms. Fair received disciplinary hearings and written reprimands.  The record is void of any incident where Plaintiff engaged in a statutorily protected expression other than her filing

of an EEOC complaint on February 21, 2006 (which is addressed in Count III), long after her altercation with Ms. Fair in July 2004. In her reply brief, Plaintiff offers no response to Defendant's argument that she failed to identify a statutorily protected expression in Count I and thus has failed to make a prima facie case of retaliation under Count II. Accordingly, judgment in favor of Defendant is proper on Count II.

Turning to Count III, Plaintiff's retaliation claim fails because she cannot establish that she suffered an adverse employment action. Adverse actions must be material; "not everything that makes an employee unhappy is actionable." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998) (tangible job consequence required for adverse employment action). An adverse employment action must be more than a mere inconvenience or an alteration of job responsibilities. The alleged act must cause a significant change in the claimant's employment status, such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." *Rhodes v. Illinois Department of Transportation*, 359 F.3d 498, 504 (7th Cir. 2004); See *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998) ("tangible employment action in most cases inflicts direct economic harm").

In Count III, Plaintiff alleges that Defendant retaliated against her by shorting several of her paychecks, moving her to another floor, failing to give her requested holidays off, and eventually terminating her employment. With respect to the first three complaints, these do not constitute a "significant change in the claimant's employment status." While the paycheck shortages might have been an inconvenience, they were not "material." See *O'Neal*, 392 F.3d at 911; *Sweeney*, 149 F.3d at 556. Moreover, it is undisputed that after Plaintiff brought the

paycheck shortage to Alisia Hill's attention, it was corrected, and Plaintiff received a paycheck for the shorted amount. Although Plaintiff believed that her paycheck was shorted "all the time," she could not recall how much money her paychecks were shorted and acknowledged that she did not have any documentation to show that she was shorted "all the time." As for moving floors, Plaintiff complained that she "had to get to know everybody all over again." Once again, "not everything that makes an employee unhappy is actionable." *O'Neal*, 392 F.3d at 911.

Plaintiff also alleges that she worked more holidays than other employees.[4] Holidays were assigned using the Vacation Request Schedule. During her deposition, Plaintiff admitted that the decisions were based on seniority, meaning that if someone more senior requested a particular holiday off, the more senior employee would get that day off and Plaintiff would have to work. Plaintiff admitted that if someone with the same seniority as Plaintiff requested a holiday off earlier than she requested the same holiday, then the earlier request would get the day off. Plaintiff also admitted that there were several employees who had more seniority than she did. Plaintiff could not specify how she was unfairly asked to work holidays that she had requested off, stating she was "not sure" and could not "remember exactly." Plaintiff testified that one co-worker got a holiday off over her, but admitted that was because she had more seniority than Plaintiff. Plaintiff also complained that another co-worker had two holidays in a row off. Yet after being shown the Vacation Request Schedule, Plaintiff was unable to point out a holiday that she had to unfairly work. Plaintiff also failed to identify any specific dates to support her claim that she was denied the use of vacation time when other employees were allowed to use vacation time. Where a plaintiff fails to do more than "make such broad-brushed, conclusory

---

[4] Plaintiff acknowledged that any employee working on a holiday, including herself, was paid overtime. See SOF ¶ 65.

allegations," her claim must fail. See *Larsen v. City of Beloit*, 130 F.3d 1278, 1282 (7th Cir. 1997).

Plaintiff's retaliation claim also fails because she cannot establish the third element of her *prima facie* case: that there is a causal connection between the adverse action and the protected expression. Plaintiff alleges that she was discriminated against after she filed her first charge of discrimination with the EEOC on February 21, 2006. Even assuming that the actions she complains of were deemed "adverse" and "material," Plaintiff has failed to demonstrate a causal link between any of the "adverse actions" and her 2006 EEOC filing. To demonstrate a causal link, a plaintiff must show that the employer would not have taken the adverse action "but for" the protected expression. *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 479 (7th Cir. 1995). Plaintiff, in her response brief, offers no compelling argument to support a causal link between her filing of an EEOC complaint and any alleged adverse employment action.

With respect to Plaintiff's claim that she was fired in retaliation for filing an EEOC charge in February 2006, the Court need not determine whether Plaintiff has established a *prima facie* case of retaliation in Count III. Rather, as with Count I, the Court can move directly to whether Defendant's nondiscriminatory reason for disciplining and terminating Plaintiff was a pretext. In its opening brief, Defendant put forth evidence that Plaintiff was fired because she committed a "major cause" infraction when she falsified a medical document. In her deposition, Plaintiff admitted that the document she submitted from Mercy Hospital had darker writing on the handwritten date indicating when she was to return to work. Falsification of the medical statement was a "major cause infraction" under the Cook County rules and regulations. Plaintiff was aware of these rules and regulations and knew that she was required to abide by them. Plaintiff was terminated, and her termination was upheld on appeal. That qualifies as a

legitimate, non-discriminatory reason for terminating Plaintiff, and Plaintiff has failed to address this reason in her response brief. For the same reasons set forth in the Court's analysis of Plaintiff's discrimination claim, the Court finds that Plaintiff has failed to demonstrate that Defendant's reason for terminating her was a pretext for retaliating against her.

## III.  Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [71] is granted and judgment is entered in favor of Defendant Cook County and against Plaintiff Nichole Frieson on all claims.

Dated:  July 21, 2010                      _____
                                                                Robert M. Dow, Jr.
                                                                United States District Judge